## MAY v. FOWLER.

### No. 1775.

Court of Appeal of Louisiana. First Circuit.

Dec. 9, 1937.

Pecot & Bauer, of Franklin, for appellant.

C. Arthur Provost, of New Iberia, for appellee.

DORE, Judge.

Plaintiff brought this suit to recover for the value of 998 chain dogs loaned by him to the defendant to be used by the defendant in rafting and towing logs to plaintiff's mill. The value of the chain dogs, which it is alleged that defendant failed to return, is fixed at 40 cents each, or $399.20, plus the sum of $10, the cost of delivering the chain dogs to defendant.

The defendant admitted receiving the chain dogs, but alleged that these chain dogs were in a raft of timber which was tendered to plaintiff under a contract between the parties wherein defendant agreed to deliver to plaintiff, who agreed to purchase, certain timber; that, without just cause, plaintiff rejected this raft of timber which later sunk in the water, the timber and the chain dogs being lost. By way of reconvention, the defendant sued plaintiff for the alleged value of the timber in this raft, on the ground that the loss of the timber was due to the failure and refusal of plaintiff to accept the timber as he had agreed to do; that the timber became water soaked and sank after a few weeks, and resulted in a total loss; that the failure of defendant to return the chain dogs was no fault of his, but was the fault of plaintiff in refusing to accept said timber.

Judgment was rendered below in favor of plaintiff for $240.14, the value of the chain dogs fixed at $230.14, plus the hauling charge of $10, and judgment was rendered in favor of the defendant for $1,000 as the value of the logs lost in the raft, making the judgment one in favor of defendant against plaintiff for the difference of $759.86. From this judgment plaintiff has taken a suspensive appeal, and the defendant has taken a devolutive appeal; the former complaining of the judgment against him on the reconventional demand as well as the amount awarded him for the chain dogs, and the latter complaining of that part of the judgment which allowed plaintiff's claim in part for the chain dogs. and refused to allow the full amount claimed as the value of the logs.

On February 11, 1935, plaintiff and defendant entered into a contract by which plaintiff agreed to purchase approximately 600 cypress trees from defendant at Flat Lake in St. Mary parish at $16 per thousand feet under splice and boom, and, in addition, he agreed to purchase from defendant during the float of that year not exceeding 250,000 feet more of cypress,

and from 50,000 to 100,000 feet of ash 10 inches and up in diameter at $16 per thousand. Plaintiff agreed to take from defendant as much willow and tupelo timber 12 inches and up in diameter at $10 per thousand as defendant delivered ash and cypress under the contract. All trees were to be straight.

It is manifest from the contract, taken in connection with the evidence in the case, that plaintiff was anxious to get as much cypress and ash as possible under the contract, and the defendant was equally as anxious to dispose of as much willow and tupelo as possible. On February 25, 1935, defendant was given credit for 75,810 feet of cypress delivered at Grassy Lake, and not at Flat Lake. On March 30th, defendant was given credit for 32,707 feet of cypress and 17,206 feet of ash delivered at Lake Chicot, and not at Flat Lake, and again on April 4, defendant was credited with 16,349 feet of cypress under the contract, none of which was accepted at Flat Lake. Up to this date there had been delivered to and accepted by plaintiff at Lake Chicot only 7,141 feet of willow and 13,597 feet of tupelo, a total of 20,738 feet of this kind of timber. As plaintiff had obligated himself to take as much willow and tupelo as ash and cypress, it follows that he was obligated to take approximately 120,000 more feet of willow and tupelo.

 Just after the delivery of the last timber above mentioned, defendant got out and placed in booms at Mile Point a raft of tupelo trees, and offered this timber to plaintiff. The timber was inspected by the timber scaler of plaintiff and rejected because the scaler claimed that most of the timber on the tow was under 12 inches and the trees were crooked. The timber was not rejected because it was not delivered at Flat Lake. All of the other timber delivered to and accepted by plaintiff under the contract, was delivered at points other than Flat Lake. The preponderance of the evidence shows that Mile Point, the place at which the tupelo was tendered, was no more inconvenient of access than the other two points at which plaintiff had accepted the other timber under the contract. As between these points of delivery and tender and the point of delivery specified in the contract, it is evident that the parties did not consider a delivery at Flat Lake as of the essence of the contract. This fact, coupled with the further fact that the timber was not rejected because it was not at Flat Lake, clearly shows that plaintiff had waived a delivery at Flat Lake.

 The fact that defendant was entitled under the contract to require plaintiff to accept some 120,000 feet of tupelo and willow at the time this raft of tupelo was tendered to and inspected by plaintiff, indicates clearly that it was tendered by defendant under the contract, and not as a separate and isolated sale as is now claimed by plaintiff. Defendant had no occasion to get out and raft this kind of timber other than to deliver it under the contract as he had just previously been doing with the kind of timber that plaintiff was anxious to get. It therefore follows that plaintiff had no legal right to refuse to take this timber if it was up to the specifications set forth in the contract.

 The only evidence in the record that the timber was not up to specifications is that of plaintiff's timber inspector. On being asked the condition of the timber when he inspected it, he answered as follows: "First, it was practically sunk when I got over to it, it was covered with water lilies and, after measuring several logs in each boom, I found that very few logs were twelve-inch and over; practically all of them being eleven inch and under; also crooked and defective trees, and we turned them down."

Against this single witness who testified that the timber was not up to specifications, the defendant and four other witnesses testified that the trees were 12 inches and up and good straight trees. While none of these witnesses actually scaled or counted the trees, they were in a good position to estimate the timber. Two of them had cut the trees and were familiar with this kind of timber, and knew the kind of timber to cut under the contract. A very significant part of the testimony of one witness who went with plaintiff's inspector to scale the timber is that the inspector stated that the timber was no good, and "that Fowler (defendant) was not going to let him (plaintiff) have any cypress."

The terms of the contract, the conduct of the parties, and the preponderance of the evidence indicate that the tupelo timber was rejected by plaintiff, not because it was crooked and below 12 inches in diameter, but because plaintiff did not want to take this tupelo for fear defendant would not deliver any more cypress, the kind of timber plaintiff most desired. Had plaintiff accept-

ed this tow of tupelo, defendant's next delivery would have been mostly cypress, and plaintiff doubted if he would get any more cypress.

After the timber was rejected by plaintiff, defendant made some effort to sell it to another mill, but this other mill would not take it, so defendant claims, because there was then no great demand for tupelo, and for the further reason that the raft had then sunk so deep in the water that it would have been difficult to tow. The raft sank four or five weeks after it was inspected by plaintiff's inspector. It appears that timber of that kind will sink in from six to eight weeks after being put in looms. The timber was a total loss to defendant. As this loss was due to the refusal of plaintiff to accept the timber, in order to determine the amount of loss, it is necessary to determine the number of feet in the tow.

■■ The burden rested upon defendant, plaintiff in reconvention, to show with legal certainty the number of feet in the tow. Two witnesses say that there were 580 trees in the tow. Defendant estimates the trees at about 500, while plaintiff's inspector gives the number of trees from 300 to 600. Some of the witnesses for defendant estimate the tupelo at 100,000 feet, besides some cypress and other trees. Defendant says that there were at least 250 feet in each tupelo, which would make 125,000 feet in the raft. The evidence shows that there was not less than 500 trees in the raft, but the evidence does not show that there was 250 feet to the tree. The tupelo which defendant delivered under the contract and which was accepted by plaintiff averaged about 144 feet to the tree. There is no reason to believe that this tupelo which was rejected by plaintiff was larger or better than that which had been accepted by him; all of the other timber delivered under the contract averaged a little less than 100 feet to the tree. The willow averaged about 123 feet to the tree, but the average of the tupelo should be taken as a basis. On this basis the 500 trees contained 72,000 feet, which, at the contract price of $10 per M. would be $720.

■ All of the chain dogs belonging to the plaintiff were on this raft of timber. The raft sank because of plaintiff's failure to accept the timber, and it follows that the loss of these chain dogs was due to the breach of contract on the part of plaintiff in refusing to accept the timber, this breach being the proximate cause of the loss of the chain dogs. This being true, plaintiff cannot hold defendant responsible for a situation which was brought about by plaintiff's own breach of contract. This part of the judgment allowing a recovery for the chain dogs should be reversed, except as to the $10 for hauling.

■ As proof of the groundless character of defendant's reconventional demand for the loss of the tupelo timber, plaintiff stresses the fact that defendant made no further demand on plaintiff after the timber was rejected, nor did he make any claim for the loss until this suit was filed for the chain dogs, almost two years after the loss. It is true that courts look with disfavor upon stale claims, whether asserted in a principal suit or used as a defense in a reconventional demand. Murphy Iron Works v. Marx & Sons, Inc., 8 La.App. 16. About the only explanation given by defendant for his failure to make a claim for the loss of the timber was that plaintiff had refused to take the timber, and it was no use for him to go back and make a demand, and he neglected to take the matter up further as he did not think that he owed for the chain dogs.

If it were not for the fact that plaintiff also waited almost two years before filing suit for the chain dogs, the laches of defendant in making a claim for the loss of the timber would militate considerably against the justness and correctness of his claim. But the claim of plaintiff arose even before that of the defendant, and, so far as the record shows, plaintiff made no demand on defendant until just a short time before this suit was filed. It might be that defendant had in mind the use of his claim as a shield against whatever claim plaintiff might assert against him.

For these reasons, the judgment appealed from is amended by reducing the amount allowed defendant on his reconventional demand from $1,000 to $720, and by reducing the amount allowed plaintiff against defendant from $240.14 to the sum of $10, that is, by reducing the judgment in favor of defendant and against plaintiff from $759.86 to $710, and, as thus amended, the judgment is affirmed. Defendant to pay the cost of this appeal; plaintiff to pay all other cost.